# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN KLEIN, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JILL SUSSMAN and DOUBLE J.R., LLC, a Delaware limited liability company, | ) | |
| | ) | |
| Defendants/Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0189-PAF |
| | ) | |
| BLUE WATER TRUST and SEQUEL INVESTMENTS, INC., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  October 30, 2023
Date Decided:  January 30, 2024

Gary E. Junge, Scott E. Chambers, SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware; *Attorneys for Plaintiff John Klein.*

Donald L. Gouge, Jr., DONALD L. GOUGE, JR., LLC, Wilmington, Delaware; *Attorney for Defendants Jill Sussman and Double J.R., LLC.*

Stephen A. Spence, MELUNEY ALLEMAN & SPENCE, LLC, Lewes, Delaware; *Attorney for Third-Party Defendants Blue Water Trust and Sequel Investments, Inc.*

**FIORAVANTI, Vice Chancellor**

In 2018, John Klein and Jill Sussman decided to go into business together to buy residential properties, renovate them, and then rent or sell them. Each brought their own strengths to the endeavor. Klein was a carpenter and was willing to front cash. Sussman was an experienced real estate agent and had access to credit. They agreed to, and later did, divvy up the responsibilities of their new enterprise accordingly.

Shortly after discussing their new enterprise and identifying their first property, Sussman delivered to Klein a proposed limited liability company agreement. The name of the business was to be "DOUBLE Jr LLC" or something similar, which was derived from the first initial in Sussman and Klein's first names. The agreement identified each of them as 50% owners and co-managers of the business. Days later, Sussman formed Double J.R., LLC (the "Company" or "DJR") as a Delaware limited liability company. When the Company purchased its first property later that month, Sussman and Klein each attended the closing and signed several documents identifying themselves as managing members of the Company. Thereafter, through the Company, Klein and Sussman purchased, renovated, and rented several other properties in Delaware.

In 2019, the parties' relationship became strained, devolving into a dispute over whether Klein is a member or manager of the Company. In this litigation over Klein's status vis-à-vis the Company, Sussman maintains that Klein was never a

member or manager of the Company. She points to, among other things, the absence of a fully executed limited liability company agreement identifying Klein as a member or manager of the Company. Instead, she relies on a limited liability agreement for Double J.R., LLC that she executed in May 2018, but never mentioned or provided to Klein, which identifies Sussman as the only member and manager of the Company.

In this opinion, which at the parties' request addresses only one aspect of the dispute, the court concludes that Klein is a co-equal member and manager of the Company.

## I.       BACKGROUND

What follows are the facts as the court finds them after trial. To avoid repetition, additional factual findings are included in the analysis portion of this opinion. The court generally resolved any conflict between witness testimony and contemporaneous communications in favor of the latter. The court generally found Sussman's testimony to lack credibility. Although Klein's recollection of events was not precise, the court generally found him to be credible on the material factual issues and more believable than Sussman.

## A.    The Parties

John Klein is a carpenter who formerly owned a business that installed custom stair rails and staircases.[1]  In 2012, Klein formed Heritage Investment Properties, LLC ("Heritage"), a Delaware LLC of which Klein is the sole member.[2]  Through Heritage, Klein began to flip houses full-time.[3]  "Flipping" is essentially when an individual buys undervalued or run-down property, renovates the property, and resells it for a profit.[4]  Klein has flipped around 70 properties since 2012.[5]  To finance these flips, Heritage borrowed cash from Blue Water Trust ("Blue Water") and Sequel Investments, Inc. ("Sequel").[6]  Blue Water and Sequel were owned by Steven A. Sell, and later by Steven's son, Joshua S. Sell.[7]

Jill Sussman is a real estate broker and investor.[8]  Sussman began purchasing properties to rent in the early 2000s and has some experience with renovating those properties.[9]

---

[1] Tr. 5:11–22 (Klein).

[2] *Id.* at 7:4–17.

[3] *Id.*

[4] *Id.* at 6:18–22.

[5] *Id.* at 9:16–18.

[6] *Id.* at 9:19–10:1.

[7] *Id.* at 10:2–6.

[8] *Id.* at 114:1–3 (Sussman).

[9] *Id.* at 111:15–18; *id.* at 114:13–18.

## B. Klein and Sussman Enter into a Business Relationship

Klein and Sussman met on January 5, 2017 when Klein contacted Sussman about a property for which Sussman was the listing agent.[10] Over the next nine months or so, Sussman showed Klein a number of homes.[11] During this period, Klein and Sussman discussed the possibility of working together to flip and rent homes.[12] Klein could offer his access to a hard-money lender and his extensive hands-on renovation expertise, while Sussman had experience with managing tenants, had access to long-term loans and other debt financing, and could handle the paperwork and accounting for the business.[13] In these discussions, Klein informed Sussman that he had unpaid back taxes and a low credit score.[14]

In early 2018, Klein and Sussman identified a property on David Street in Frederica, Delaware (the "David Street Property") as their first acquisition. On March 23, 2018, Sussman sent a text message to Klein with the address of the property.[15] On March 25, 2018, Sussman sent a text message to Klein indicating that she would email to him "the usual partnership agreement I use," adding: "We

---

[10] *Id.* at 12:6–13:6 (Klein).

[11] *Id.* at 12:18–13:6.

[12] *Id.* at 13:7–13.

[13] *Id.* at 13:14–15:6.

[14] *Id.* at 15:2–17; *id.* at 115:14–23 (Sussman).

[15] JX 50.

can tweak it, but I just want you to see it/get an idea of it."[16] Later that day, Sussman sent an email to Klein attaching an operating agreement (the "March 25 Operating Agreement"), which provided for the formation of "a limited liability company (or other corporate entity)" named "'DOUBLE Jr LLC' and/or a variation of same."[17] The name, Double J.R., LLC, stood for "Jill and John's Rentals."[18]

The March 25 Operating Agreement is dated April 2, 2018.[19] It identifies Klein and Sussman as the "current members," with each owning a 50% membership interest, and has signature blocks with each of their names typed below the applicable signature lines.[20] The March 25 Operating Agreement states that "[t]he purpose of the LLC shall be to purchase, manage, distribute, collect and otherwise derive income from an investment business with a focus on real estate purchases, acquisitions, rentals, real property improvement and other legal enterprises."[21] It further provided that all firm decisions would be unanimous and that "[a]greed expenses incurred by members on behalf of the firm are subjected to reimbursement by the firm. The LLC shall be responsible for any and all expenses related to subject

---

[16] JX 55.

[17] JX 47 at 3.

[18] Tr. 117:19–21 (Sussman).

[19] JX 47 at 1.

[20] *Id.* at 5.

[21] *Id.* at 1.

properties and/or any expenses mutually agreed upon."[22]   Klein forwarded the attachment to a nearby Staples office supplies store for printing.[23]

On March 27, 2018, Sussman texted Klein: "Got a verbal agreement on Frederica."[24]  On March 28, Sussman wrote to Klein that she would "get the LLC done maybe tomorrow."[25]  On March 29, 2018, Sussman asked Klein if he had a chance to look over the operating agreement or whether they should look at it together.[26]

Klein contends that after March 29, he met Sussman outside of her house and that they both signed the operating agreement on the top of a car.[27]  Under Klein's narrative, Sussman took the signed original and was supposed to send him a copy.[28] Sussman never returned a signed copy to Klein.  Sussman denies that this meeting ever occurred.[29]

---

[22] *Id.* at 2.

[23] *See* JX 47.

[24] JX 55.

[25] JX 57.

[26] *Id.*

[27] Tr. 70:18–21 (Klein).

[28] *Id.* at 74:21–22.

[29] *Id.* at 222:16–19 (Sussman).

Sussman contends that she sent the email with a form of operating agreement to Klein to begin the discussion about a potential LLC.[30] Sussman maintains that the version of the operating agreement that she sent to Klein did not reflect the terms of their arrangement, which was instead intended to be a vesting agreement under which Klein would eventually become a 50% member of the LLC after "he handled his tax situation."[31] There are no contemporaneous communications reflecting any type of vesting arrangement.

In an April 11, 2018 text message exchange, Klein and Sussman discussed business logistics, such as obtaining insurance and legal representation.[32] Klein asked when the LLC would be "completed," to which Sussman assured him, "no later than tomorrow afternoon!"[33] She immediately followed up by informing Klein that, "then we have to open a bank account," because "the LLC needs a bank account."[34]

Later that day, Sussman filed a certificate of formation with the Delaware Secretary of State forming a Delaware limited liability company named Double J.R.,

---

[30] *Id.* at 118:10–119:8.

[31] *Id.* at 121:2–7.

[32] JX 51.

[33] *Id.*

[34] *Id.*

LLC.[35]   Sussman is identified in the certificate of formation as the Company's registered agent, and she signed the document as the "Authorized Person."[36]   The certificate of formation does not identify any members or managers of the Company.

## C.   DJR Acquires Properties

### 1.   The West David Street Property

On April 30, 2018, DJR purchased the David Street Property.[37]   Klein submitted a financing application to Blue Water and Sequel on behalf of himself and Sussman, requesting a loan of $80,000.[38]   In a handwritten note attached to the application, Klein noted that "Jill is forming our LLC.  Says it should be completed by tomorrow."[39]   Subsequent documentation noted a personal guarantee by both Klein and Sussman, as well as a note that Blue Water had "done multiple loans with John Klein the owner of Double JR, LLC."[40]

Both Klein and Sussman were physically present for the closing on the David Street Property.  At closing, Klein and Sussman each signed several documents,

---

[35] JX 52.

[36] *Id.*

[37] JX 1.

[38] JX 3 at 1.

[39] *Id.* at 2.

[40] JX 2.

including a guaranty agreement,[41] a mortgage,[42] a disclosure regarding their "deed in lieu of foreclosure" provision,[43] and a real estate tax return.[44] Klein and Sussman signed each of these documents as the managing members of DJR.[45] The Guaranty of Payment and Performance, the Disclosure Regarding "Deed in Lieu of Foreclosure," and the Mortgage each contained notarized statements affirming that Klein and Sussman were signing as the managing members of DJR.[46] Joshua Sell testified that there was no discussion about excluding Klein from these documents.[47]

After purchasing the David Street Property, Sussman suggested that Klein's low credit score and unpaid back taxes may be having a negative effect on their

---

[41] JX 1.

[42] JX 6.

[43] JX 4.

[44] JX 33.

[45] *See* JX 1 (Guaranty of Payment and Performance); JX 4 (Disclosure Regarding "Deed in Lieu of Foreclosure"); JX 5 (Deed in Lieu of Foreclosure); JX 6 (Mortgage); JX 7 (Note); JX 18 (Land Management Records Routing Form); JX 33 (Real Estate Tax Return Declaration of Estimated Income Tax); JX 34 (Realty Transfer Tax Return and Affidavit of Gain and Value).

[46] JX 1; JX 5; JX 6. Sussman testified that she "vaguely remember[s]" telling the attorney at the time that Klein was not supposed to be signing these documents, that she wasn't paying attention, and that she assumed that it would be fixed. Tr. 133:17–134:20 (Sussman). This testimony was not credible.

[47] JX 88 at 32:3–10 (Joshua Sell).

subsequent refinancing efforts.[48]  They agreed to leave Klein's name off of future refinancing documents to avoid any potential issue in that regard.[49]

On May 5, 2018, Sussman opened a bank account for DJR with WSFS Bank.[50] According to Sussman, WSFS required DJR to provide a copy of the operating agreement in order to open the account.[51]  Sussman did not have a copy of an operating agreement at that time, so she accepted a form LLC agreement from the WSFS bank teller, who inserted "Double JR LLC" on the first page of the form.[52] While at the bank, Sussman wrote her name and address on the pages that listed the members and managers and signed and dated the document May 5, 2018.[53]  Sussman did not identify Klein as a member or a manager of the Company in the WSFS form operating agreement and she did not inform Klein that she had executed the WSFS form operating agreement for DJR.[54]

---

[48] Tr. 40:4–13 (Klein).

[49] *Id.* at 39:23–40:19.

[50] *Id.* at 226:10–15 (Sussman).

[51] *Id.* at 226:16–18.

[52] *Id.* at 226:23–227:6.

[53] *Id.* at 227:7–17.

[54] JX 64.  Sussman testified that she provided a copy of the signed WSFS form operating agreement to real estate counsel in connection with future property purchases.  Tr. 224:16–22 (Sussman).  No written operating agreement is included in the closing documents submitted in this case.  Sussman also admitted to telling Steven Sell, the principal of Blue Water and Sequel, that there was no written operating agreement for DJR.  *Id.* at 209:9–15.

## 2.    The South Governors Avenue Property

In early August 2018, Klein and Sussman submitted another loan application to Blue Water and Sequel, this time to purchase a property on South Governors Avenue in Dover, Delaware (the "South Governors Property").[55]  The application sought a loan of $74,000, to be wired in advance of the settlement date, August 16, 2018.[56]  Both Klein and Sussman personally guaranteed the loan.[57]  The loan from Sequel was approved, and the approval letter noted that the borrower would be required to provide approximately $13,000 in cash.[58]  The HUD-1 settlement statement for the property indicated that $10,655.58 was due in cash from the borrower, an amount that was paid via a loan from Blue Water to Klein.[59]  Klein took out a mortgage on one of his personal properties in order to secure this loan.[60] Klein repaid the loan, but DJR never reimbursed him for this expenditure.[61]

---

[55] JX 25.

[56] *Id.*

[57] *Id.*

[58] JX 26 at 2.  The loan approval letter was addressed only to Sussman, which Klein testified was a result of his conversation with Joshua Sell that Klein no longer wanted his name on paperwork due to the impediments with refinancing.  Tr. 44:5–14 (Klein).

[59] JX 28; Tr. 45:12–47:8 (Klein).

[60] Tr. 45:12–47:8 (Klein).

[61] *Id.* at 49:10–15.

### 3. The North New Street Property

On August 29, 2018, DJR purchased a property on North New Street in Dover, Delaware (the "New Street Property"). Klein and Sussman again sought financing from Blue Water.[62] Sussman personally guaranteed the Blue Water loan.[63] For this property, DJR was required to deliver approximately $12,000 at closing.[64] Klein approached Sussman about her contributing half of the cash amount, but she declined. Sussman held Klein to his original agreement to supply all the cash up-front.[65] At closing, Klein delivered a $14,166.09 cash payment.[66] Klein secured the cash from Blue Water by once again borrowing against his home, which he owned through Heritage.[67] Klein collected the rent from the New Street Property, managed renovations, and handled repairs to the occupied unit.[68]

### 4. The North Governors Street Property

At the same time as the purchase of the New Street Property, DJR purchased a property on North Governors Street in Dover, Delaware (the "North Governors

---

[62] JX 8; JX 35.

[63] JX 9 ¶ 13.

[64] *Id.* ¶ 12.

[65] Tr. 52:4–13 (Klein).

[66] JX 37.

[67] Tr. 52:19–53:22 (Klein).

[68] *Id.* at 54:10–55:12.

Property"). Sussman again applied for a loan from Sequel, which it granted.[69] The loan approval letter specified that DJR should bring approximately $12,000 to closing.[70] At closing, Klein supplied $12,775.97 in cash to meet this obligation.[71] Consistent with his past practices, Klein obtained the cash by borrowing against his home.[72] After DJR purchased the property, Klein facilitated the renovations on the North Governors Property and collected rent.[73]

### 5. The Peach Basket Road Property

DJR purchased a final property in May 2019 located on Peach Basket Road in Felton, Delaware (the "Peach Basket Property"). DJR once again sought financing from Blue Water, this time in the amount of $198,000.[74] The loan was approved, and Blue Water indicated that the borrower would need to bring approximately $40,000 to closing.[75] Blue Water's principal, Joshua Sell, suggested that Sussman should be required to contribute to the down payment.[76] When Klein communicated Sell's comment to Sussman, she responded: "I don't do that in my

---

[69] JX 21.

[70] *Id.* ¶ 12.

[71] JX 24.

[72] Tr. 58:4–9 (Klein).

[73] *Id.* at 58:17–59:8.

[74] JX 13.

[75] JX 14 § 12.

[76] Tr. 62:19–63:3 (Klein).

13

partnerships, and you were supposed to supply all the money."[77]  She refused to provide any money for closing.  Klein supplied all $38,321.83 in cash necessary to close, which he again obtained through a loan on a property he owned through Heritage.[78]

The Peach Basket Property included three homes as well as a garage and was larger than DJR's previous purchases.[79]  Sussman and Klein planned to subdivide the property after the acquisition.[80]  While working on the Peach Basket Property, Klein and Sussman began to disagree about the amount they were paying to undertake this project.[81]  Sussman believed that Klein was inflating his renovation costs and shirking responsibility for duties within his domain.[82]

### D.    Refinancing

As Sussman and Klein had agreed, Sussman endeavored to refinance the loans that DJR obtained for the properties.  Sussman refinanced the South Governors Property and North Governors Property in early spring 2019.[83]  After those

_____

[77] *Id.* at 63:3–8.

[78] *Id.* at 62:3–18.

[79] *Id.* at 59:21–50:3.

[80] *Id.* at 60:4–20.

[81] *Id.* at 64:4–65:19; JX 42.

[82] JX 43; Tr. 157:13–160:11 (Sussman).

[83] Tr. 225:10–14 (Sussman).

properties were refinanced, DJR had $36,000 in available cash.[84] Despite significant work remaining on the David Street Property, Sussman allocated only $20,000 to complete the work on the project.[85] Sussman used the remaining $16,000 to pay her personal credit card debt.[86]

### E. The Parties' Relationship Breaks Down.

Shortly before purchasing the Peach Basket Property, the parties' business relationship was showing signs of stress. In March 2019, Klein began demanding information from Sussman about the business.[87] In a March 13, 2019 email, Klein requested documents related to the recent refinancing and the company's general finances.[88] Sussman then demanded information from Klein to document his renovation expenses.[89] She even refused to attend the closing for the Peach Basket Property until Klein answered her questions regarding rehabilitation costs.[90]

Around the time of the closing on the purchase of the Peach Basket Property, Klein and Sussman were also exploring the possibility of purchasing a property on

---

[84] *Id.* at 198:12–199:3.

[85] *Id.*

[86] *Id.*

[87] JX 40.

[88] *Id.*

[89] Tr. 188:17–18 (Sussman) ("Well, I started asking for more documentation, so I guess it was, like, tit for tat.").

[90] JX 44.

Heald Street in Wilmington, Delaware. In an exchange on May 19, 2019, Klein objected to the prospect of Sussman receiving a 3% commission on the sale, contending that the commission should go to DJR rather than Sussman's brokerage.[91] Klein argued: "I don't charge any money for any time I apply to this business and you shouldn't either."[92] Sussman simply responded that she disagreed.[93] The parties also disputed whether they had agreed to purchase properties only through DJR.[94] Sussman threatened to buy the property without Klein and noted that even if she chose to purchase the property with Klein, "this is the last one."[95]

### F. Sussman Reneges on her Agreements with Klein.

Sussman took a hard line with Klein after their relationship had soured. She denied that Klein was ever a member or manager of DJR. Rather, she maintained that the agreement from the outset was for Klein to potentially attain a membership interest in DJR after he resolved his tax issues. Sussman testified that in either May or June of 2019, she and Klein decided to document their arrangement in a "vesting

---

[91] JX 45.

[92] *Id.* (cleaned up).

[93] *Id.*

[94] JX 46.

[95] *Id.*

16

agreement."[96]   She contends that there are text messages and a written vesting agreement which acknowledge that Klein is not a member of DJR and document the parties' long-held agreement that Klein's interest in the Company would vest over time.  Sussman's testimony regarding this agreement was not credible.[97]  She was likewise unable to produce any text messages to support her testimony.[98]

## G.    Procedural History

On March 12, 2020, Plaintiff filed a verified complaint seeking an order declaring him to be a 50% member and co-equal manager of DJR, an accounting, and other equitable relief.[99]  On August 6, 2021, Defendants answered the complaint

---

[96] Tr. 183:17–184:12 (Sussman).  At trial, Kristin Collison, Esquire testified as to the negotiations between Sussman and Klein in 2019 in trying to paper the deal.  Plaintiff objected to the testimony as containing inadmissible settlement communications under Delaware Rule of Evidence 408.  After sustaining the objection once, the court noted that it would "allow this line of questioning, but [would] most likely to strike it and not consider it in post-trial briefing."  Tr. 261:10–12.  The court concludes that these communications are inadmissible.  *Wright v. Moore*, 931 A.2d 405, 407 (Del. 2007) ("Rule 408 of the Delaware Rules of Evidence provides that evidence of a settlement is inadmissible to prove liability for or invalidity of the claim or its amount.").  In any event, they do not persuade the court that Klein and Sussman agreed to anything other than an equal 50-50 ownership interest in DJR in 2018.

[97] When shown a draft vesting agreement dated in July 2019, Sussman testified that it did not reflect the terms of her original agreement with Klein.  Tr. 254:2–255:1 (Sussman) (denying that JX 67 was the vesting agreement to which she referred).

[98] *Id.* at 186:24–187:11 ("A.  That's all in the texts as well.  Q.  Okay. And are you going to provide any of them today or . . . ?  A.  Sure. I can. I can fire it off for you.  I'd prefer to send it to you tomorrow, because I don't feel good.  Q.  That's too late.  It had to be submitted already, but --  A.  They were -- they were sent in with discovery.  Q.  Okay.  I'll talk to your attorney about it.").

[99] Dkt. 1.

and asserted counterclaims for breach of contract and tortious interference with contract.[100]  On the same day, Defendants asserted third-party claims against Blue Water and Sequel for breach of contract, bad faith/willful misconduct, and breach of fiduciary duties in the same amount and to the same degree of any damages that the Defendants are ordered to pay to Plaintiff.[101]

On May 23, 2022, the court approved a stipulation bifurcating the trial.  In the first phase, the parties would try Counts I, II, and V of Plaintiff's complaint, which asserts claims for declaratory judgment, accounting, and breach of fiduciary duty.[102] The court held a one-day trial on June 16, 2022.  Following post-trial argument, the parties requested that the court withhold decision while they sought a potential resolution.  In October 2023, the parties requested that the court decide the threshold question of whether Klein is a member and manager of DJR.  This opinion is limited to those issues.

## II.   ANALYSIS

The question for decision following trial is whether Klein is a 50% member and a coequal manager of DJR.  Klein, as the plaintiff, bears the burden of proof as to his entitlement to relief by a preponderance of the evidence.  *Osborn ex rel.*

---

[100] Dkt. 15.

[101] Dkt. 16.

[102] Dkt. 44.

*Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009), *aff'd*, 991 A.2d

1153 (Del. 2010).

> Section 18-301(a) of the Delaware Limited Liability Company Act provides:
>
> In connection with the formation of a limited liability company, a person is admitted as a member of the limited liability company upon the later to occur of:
>
> (1) The formation of the limited liability company; or
>
> (2) The time provided in and upon compliance with the limited liability company agreement or, if the limited liability company agreement does not so provide, when the person's admission is reflected in the records of the limited liability company or as otherwise provided in the limited liability company agreement.

6 *Del. C.* § 18-301(a).

The Delaware LLC Act seeks "to give maximum effect to the principle of

freedom of contract and to the enforceability of limited liability company

agreements." 6 *Del. C.* § 18-1101(b). Delaware's LLC Act defines a limited liability

company agreement as "any agreement (whether referred to as a limited liability

company agreement, operating agreement or otherwise), written, oral or implied, of

the member or members as to the affairs of a limited liability company and the

conduct of its business." 6 *Del. C.* § 18-101(9). A limited liability company

agreement is not subject to the statute of frauds. *Id*. The LLC Act further provides:

"A member or manager of a limited liability company or an assignee of a limited

liability company interest is bound by the limited liability company agreement

19

whether or not the member or manager or assignee executes the limited liability company agreement." *Id.*

"When analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts." *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 923–24 (Del. 2023). "Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members." *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009).

## A. Contract Formation.

"[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). "Overt manifestations of assent rather than subjective intent control contract formation." *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006). In determining whether a party intended that a contract would bind them, "the court reviews the evidence that the parties the evidence that the parties communicated to each other up until the time that the contract was signed --- *i.e.*, their words and actions --- including the putative contract itself." *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229–30 (Del. 2018). To prevail, plaintiff

must prove that a contract exists by a preponderance of the evidence. *Morton v. Evans*, 1998 WL 276228, at *2 (Del. Ch. May 15, 1998).

Delaware follows the mirror-image rule. *Friel v. Jones*, 206 A.2d 232, 233–34 (Del. Ch. 1964), *aff'd*, 212 A.2d 609 (Del. 1965). An offer is a manifestation of assent that empowers another to enter into a contract and confers upon the offeree the power to create a contract. *L-5 Healthcare P'rs, LLC v. Alphatec Hldgs., Inc.*, 2020 WL 6021536, at *6 (Del. Ch. Oct. 12, 2020). "A valid offer contains sufficient finality such that an offeree's acceptance of an offer constitutes the last step in forming a contract." *Id.* To accept an offer, the contractual counterparty must convey an expression of commitment that is not conditioned on further action by either party and that does not vary the terms proposed by the offer. *Ramone*, 2006 WL 905347, at *11. "The fact that the parties to an oral agreement manifest an intention to prepare and adopt a written memorial will not prevent contract formation if the evidence reveals manifestations of assent that are in themselves sufficient to conclude a contract." *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017). Of course, this rule does not apply if the parties "positively agree that there will be no binding contract until the formal document is executed." *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998).

Klein argues that he and Sussman signed the operating agreement on the hood of a car prior to purchasing the David Street Property.[103] Klein contends that after they executed the agreement, Sussman took the original and was supposed to send him a copy. No fully executed version of the March 25 Operating Agreement has been produced in this litigation, and Sussman denies Klein's version of events. The court need not reach the question of whether the parties actually signed the March 25 Operating Agreement because even if they did not, the court finds that the parties agreed that Klein would own 50% of the DJR membership interests and would be a co-manager of the Company as described in the March 25 Operating Agreement.

Sussman sent Klein an operating agreement on March 25, 2018.[104] The agreement provided for the governance of "a limited liability company (or other corporate entity)" named "Double Jr LLC," which would commence as of April 2, 2018.[105] The recitals declared that Klein and Sussman "are equal partners in an investment business focusing on real estate purchases, acquisitions, rentals, real property improvement and other legal enterprises."[106]

---

[103] Tr. 70:18–21 (Klein).

[104] JX 47.

[105] *Id.* at 3.

[106] *Id.*

22

On March 27, 2018, Sussman texted Klein, "[g]ot a verbal agreement on Frederica."[107] On March 28, Sussman told Klein she would "get the LLC done maybe tomorrow."[108] On March 29, 2018, Sussman asked Klein if he had a chance to look over the operating agreement or whether they should look at it together.[109] On April 11, 2018, Klein asked Sussman via text when the LLC would be completed, and she replied that it would be finished by the afternoon of the 12th at the latest.[110] She then immediately responded to Klein that "then *we* have to open a bank account," confirming to Klein that "yes the LLC needs a bank account."[111]

Through her conduct and her conversations with Klein, Sussman agreed that she and Klein would form an LLC with each of them being equal members and co-managers. Sussman's email to Klein attaching the March 25 Operating Agreement noted that the form could be "tweaked," not that the material terms—including the identities of the managers, members, and their membership interests (which Sussman specifically included) were open issues. Bluntly stated, taking someone from being a member with a 50% interest in the entity to having no equity or managerial interest in the Company is not a "tweak." It would amount to a complete

---

[107] JX 55.

[108] JX 57.

[109] *Id.*

[110] JX 51.

[111] *Id.* (emphasis added).

23

abandonment of the parties' agreement. The business would not be Double JR, but instead Single JR. Even if the parties did not execute the March 25 Operating Agreement, they agreed to those standard terms as governing their member and management rights in DJR. Indeed, there are no other contemporaneous communications between Klein and Sussman indicating that they intended to proceed with their business venture other than as equal owners and managers of DJR.

Sussman's subsequent conduct also manifested her intent to be bound by the material terms of the March 25 Operating Agreement. "[A] court may consider a reneging party's post-signing conduct if it reflects an objective manifestation of the reneging party's intent to be bound by the agreement." *Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *21 (Del. Ch. June 30, 2023); *see Sarissa*, 2017 WL 6209597, at *24 n.264 ("'The parties' actions following the deal are also informative' in determining whether they mutually assented to be bound." (quoting *Trexler v. Billingsley*, 166 A.3d 101, 101 (Del. 2017) (TABLE)); *see also* Restatement (Second) of Contracts § 202 cmt. g (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."); 17A C.J.S. Contracts § 427 ("A party's conduct may be evidence of its intent . . . so long as that conduct evinces an interpretation contrary to that party's interest."). After confirming with Klein that he agreed with the terms of the operating agreement on March 29, Sussman formed the LLC, named to reflect

24

Klein and Sussman's joint ownership, on April 11. Based on their mutual understanding that they had reached an agreement, the parties discussed the division of responsibility as to opening a checking account and obtaining insurance. The parties settled all material terms to their agreement and evinced mutual assent to be bound by the terms of their agreement. Accordingly, the parties entered into an enforceable operating agreement.

Under their arrangement, Klein was responsible for providing all upfront financing. Over the course of Klein and Sussman's relationship, Klein provided over $75,000 in upfront cash for DJR to purchase properties. Sussman and Klein signed multiple documents in connection with the purchase of their first property indicating that they both were managing members of DJR.[112] Sussman also referred to Klein as a "partner" in DJR.[113] Not only did Klein provide the up-front cash to purchase the properties, but Sussman actually insisted upon it under the terms of their agreement.

---

[112] *See* JX 1; JX 5; JX 6; JX 7; JX 18; JX 33; JX 34.

[113] *See* JX 56 (referring to their relationship as a partnership); Tr. 123:23–24 (Sussman) ("I was treating him as a partner from day one."); *id.* at 63:3–8 (Klein) (repeating Sussman's statement that "I don't do that in my partnerships"). Consistent with her understanding of Klein's role as a member and manager of the LLC, Sussman supplied books and records of DJR to Klein upon his request. Tr. 187:19–188:7 (Sussman); JX 40.

25

**B. The March 25 Operating Agreement Controls.**

"In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role in these disputes is to interpret the contract and effectuate the parties' intent." *A&J Cap., Inc. v. Law Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018) (cleaned up). The parties' operating agreement is reflected in the March 25 Operating Agreement.[114]

Section 1.8 of that agreement, which Sussman drafted, states: "The current members and their respective interest are as follows: JILL SUSSMAN 50%[,] JOHN KLEIN 50%."[115] The parties voiced no intention to alter this term, and instead, incorporated that term into their operating agreement. Likewise, Section 1.3 provides that "All firm decisions shall be unanimous, with the exception of a decision to dissolve said membership."[116] The recitals also noted that the parties intended to be "equal members."[117] Consistent with these terms, the parties discussed their intention to split responsibilities between them, with Klein responsible for providing upfront funding and managing renovations, and Sussman responsible for refinancing DJR's debt and collecting rent. They proceeded in

---

[114] JX 47.

[115] *Id.* at 4.

[116] *Id.* at 3.

[117] *Id.*

26

accordance with that agreement. Indeed, Sussman was quick to remind Klein that Sussman was not obligated to contribute cash to DJR's acquisitions, stating: "[I]f your [sic] asking me to put cash in the [a]nswer is no. It was on you to get the deals done with no cash until the business can do it on its own. It was on me to get them financed."[118] The evidence overwhelmingly demonstrates that Klein and Sussman intended to operate DJR as equal members and managers as reflected in the March 25 Operating Agreement.

### C. The WSFS Form Operating Agreement Is Not Operative.

Sussman only fleetingly asserts that the WSFS form operating agreement is DJR's controlling agreement.[119] It is not. The March 25 Operating Agreement, which predates the WSFS form operating agreement, provides that "This operating agreement may be amended from time to time by a unanimous agreement of the members. Any amendments shall be done in writing, signed by each member and provided to each member."[120] Klein did not agree to the terms of the WSFS form operating agreement, and there is no writing reflecting any amendment to the March

---

[118] JX 48.

[119] In August 2019, Steven Sell asked Sussman for an operating agreement to show who makes the decisions for DJR, and he "was told that there is no operating agreement." JX 30. Sussman's statement to Sell undermines Sussman's assertion that the WSFS form operating agreement was the Company's operative agreement.

[120] JX 47.

25 Operating Agreement. Accordingly, the March 25 Operating Agreement controls, and the WSFS form operating agreement does not.

## III. CONCLUSION

For the foregoing reasons, Klein and Sussman are each co-managers of DJR and each owns a 50% membership interest in the Company. The parties are directed to confer and submit an implementing order within five business days.